607 So.2d 576 (1992)
STATE of Louisiana, Plaintiff-Appellee,
v.
SEVENTY-SEVEN THOUSAND FOURTEEN & NO/100 ($77,014.00) DOLLARS (Hui Suk Perez), Defendant-Appellant.
No. 91-282.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1992.
On Rehearing November 6, 1992.
*577 Rivers, Beck & Dalrymple, Kenneth A. Doggett, Chris Roy, Jr., Alexandria, for defendant-appellant.
Thomas Yeager, Asst. Dist. Atty., Alexandria, for plaintiff-appellee.
Before DOUCET and YELVERTON, JJ., and MARCANTEL[*], J. Pro Tem.
PER CURIAM.
This is an appeal from a forfeiture procedure under La.R.S. 40:2601 et seq. The State Police received information from a U.S. Customs Agent that Hui Suk Perez, a Korean National, would be arriving at Esler Regional Airport in Alexandria, and would be in possession of narcotics or a large sum of money. On January 2, 1991, Ms. Perez was picked up at the airport by her babysitter, James Carver. Carver's vehicle was stopped for "erratic driving" by Trooper Lyn Anderson. Anderson did not testify at trial. Herbert Cross, another trooper, testified as to what Anderson told him. According to Cross, Anderson asked Perez if he could search her luggage and she consented. Anderson found $22,900 in cash and two money orders for $700 in a tote bag. He found $2,814 in cash and two more $700 money orders in her wallet. She gave Anderson $36,600 in cash and 3 money orders for $700 each which had been in a pair of pantyhose tied around her waist. A drug dog was brought to the scene. It "alerted" on the tote bag. However, no drugs were found. Perez and Carver went to the Police station where they were questioned *578 by Cross. Perez told Cross that she had sent Carver 14 money orders for $700 each. Cross stated that Perez and Carver consented to a search of the mail at Carver's house. A search was conducted and the money orders seized.
The State filed a notice of pending forfeiture and served Perez. Perez filed a claim for return of the property. The State filed a petition for forfeiture. After a hearing, the judge ordered the money forfeited to the State. Perez appeals.
La.R.S. 40:2601 et seq. governs forfeiture proceedings. Under those provisions, the State has the burden of proving probable cause for forfeiture. After reviewing the record, it does not appear that the State carried this burden. There was no evidence connecting the forfeited money to the drug trade, nor was there any evidence connecting Perez with the drug trade. See State v. Spooner, 520 So.2d 336 (La.1988) which deals with forfeiture under La.R.S. 32:1550. Accordingly, the judgment of the trial court is reversed.
REVERSED.

ON REHEARING
This civil appeal was placed on our summary docket and the judgment was reversed in a memorandum opinion. We granted a rehearing on application of the State. After a careful reconsideration of the record, we remain convinced that our original decision was correct. Our reasons in a full opinion follow.
The case arises from a forfeiture proceeding instituted pursuant to La.R.S. 40:2601 et seq. The trial court entered judgment in favor of the state ruling that it had established probable cause to forfeit the money, and that the claimant had failed to establish by a preponderance of the evidence that the money was not subject to forfeiture.
The original opinion of this court concluded with the following:
La.R.S. 40:2601 et seq. governs forfeiture proceedings. Under those provisions, the State has the burden of proving probable cause for forfeiture. After reviewing the record, it does not appear that the State carried this burden. There was no evidence connecting the forfeited money to the drug trade, nor was there any evidence connecting Perez with the drug trade. See State v. Spooner, 520 So.2d 336 (La.1988) which deals with forfeiture under La.R.S. 32:1550. Accordingly, the judgment of the trial court is reversed.
The discussion of the assignments of error raised on application for rehearing by the state will include a thorough review of the evidence presented at trial, but a summary of the facts will be helpful.
A United States Custom Service Agent notified members of the Louisiana State Police on January 2, 1990, that Hui Suk Perez would be arriving at Esler Regional Airport in Alexandria, and carrying narcotics or a large sum of money. Ms. Perez was greeted at the airport by James Carver, her babysitter, who began to drive her home to Leesville but was stopped by Trooper Lyn Anderson for a traffic violation. Ms. Perez eventually gave consent to search her carry-on luggage, a tote bag, which turned up twenty-four thousand three hundred ($24,300.00) dollars in cash and money orders in brick-shaped bundles wrapped in black plastic and rubber bands. A search of Ms. Perez's wallet found four thousand two hundred fourteen ($4,214.00) dollars in cash and money orders. Ms. Perez had tied panty hose around her waist containing numerous envelopes with thirty-eight thousand seven hundred ($38,700.00) dollars in cash and money orders. No drugs were found on Ms. Perez, but a drug-detecting dog did give a positive alert to the presence of drug residue on the bricks of money in the tote bag. Later, consent was given by Ms. Perez and Mr. Carver to search the mail she had sent to herself and was kept at her neighbor's house. Nine thousand eight hundred ($9,800.00) dollars in money orders were found. All money orders seized from Ms. Perez and at Mr. Carver's house were for the amount of seven hundred ($700.00) dollars each which is the maximum amount a United States Postal Service Money Order may be issued.
*579 FACTS:
At the forfeiture hearing, the state presented the testimony of Trooper Herbert Cross of the Louisiana State Police who described the circumstances of his tip about Ms. Perez, the stop of the Carver truck, and the search for the money. No motion to suppress and no objection to hearsay testimony were made by the claimant, therefore this court cannot review the admissibility of this evidence.
Trooper Cross testified about how the "bricks" or bundles of envelopes carried in Ms. Perez's tote bag were covered in black plastic and wrapped in rubber bands. This money was subject to the positive alert by a drug detection dog. Trooper Cross also testified about the money found wrapped around Ms. Perez's waist and identified a photograph of it.
At the time of the stop, Ms. Perez gave conflicting explanations for the source of the money, and denied having any more money than that found in her wallet and luggage.
The next witness was Trooper Timothy Ledet who testified about the qualifications of the drug detection dog, Sugar, and how she gave a positive alert to the plastic wrapped bundles in Ms. Perez's tote bag. He further testified that the dog did not alert to the presence of drug residue on the money in the panty hose. Finally, Trooper Ledet testified that no chemical analysis was performed on the money or the tote bag.
Agent John Nattinger of the Drug Enforcement Administration was qualified as an expert witness in drug trafficking, tracing drug proceeds, and how money is packaged for the purchase of drugs. Mr. Nattinger testified that the network for transporting money generated by drug sales is separate from the network for distributing the drugs. The couriers or transporters for the money derived from drugs are commonly called "mules" or "smurfs" and they try not to attract attention. These mules or smurfs deliver the money to a prearranged representative of the drug organization, but not to the drug dealer, himself. This keeps the money separate from the drugs and facilitates money laundering.
Mr. Nattinger described money laundering as taking money, and in the illegal drug business large amounts of cash are generated, derived from illegal activity and putting it into general commerce without raising the suspicion of law enforcement as to the illegal origin of the money. This purpose can be achieved through businesses which generally deal in cash, bars and restaurants are examples. No records are kept for the cash because it can be used in court against drug traffickers or money launderers.
Mr. Nattinger concluded that the money possessed by Ms. Perez was derived from drug trafficking considering twelve factors commonly associated with mules or smurfs transporting drug money.
The state's final witness was George Louis Miller of the U.S. Custom Service who described the investigation into Ms. Perez's activities since the end of 1988 up until the seizure of the money on January 2, 1990. The Vernon Parish-Leesville Narcotics Task Force had received information about Ms. Perez from its informants and relayed this to Agent Miller. Agent Miller spoke with one of the confidential informants and was told how Ms. Perez made four trips since Spring of 1988, and was later seen with large amounts of cash and exhibited sudden wealth. By use of long distance telephone calls or the lack of such calls, and airline reservations, Agent Miller reconstructed the four trips Ms. Perez made to New York City in 1988, and the six trips she made in 1989. Agent Miller testified about an Asian male, whom Ms. Perez called her "money man," visiting Ms. Perez in January of 1989, and how Ms. Perez left for a three week visit to New York City with a large suitcase nearly empty.
After Ms. Perez filed her claim for the money seized claiming it as earnings from the Shim Shim Club, the Shim Shim Club could not be located by Customs Service agents at the address given by Ms. Perez. When Ms. Perez testified at the forfeiture hearing, she gave the correct address of Shim Shim Club and identified photographs *580 of the club. Ms. Perez's fiance, Anthony Ka Cheong Chan, verified the existence of the club, Ms. Perez's working there and provided a Chinese language newspaper advertisement informing the readers the club would reopen after renovations.
When Ms. Perez testified she described how she worked as a cocktail waitress in Leesville area bars. Divorced from her first husband, Ms. Perez would not tell her second husband how much money she had earned so he would not take it. Her earnings from her salary and tips, plus extra money earned from being an illegal "B-girl" at the Leesville bars averaged one hundred dollars each night. Ms. Perez claimed she worked for six weeks at the Shim Shim Club in 1987. At her deposition before the hearing, Ms. Perez claimed she never brought money to Leesville until January 2, 1990, but at the forfeiture hearing she admitted bringing eight thousand dollars ($8,000.00) back from New York City in 1987.
Ms. Perez purchased the Golden Bell Club for thirteen thousand dollars ($13,000.00) in cash in 1988. The bar did not make much money because it was off limits to military personnel until February, 1989. Several men lived with Ms. Perez and provided her support. The Asian male seen with her in January of 1988 was a "Mr. Vin" who was a friend and not her "money man."
Because the bar was not very profitable and she wanted to open a restaurant, Ms. Perez again returned to the Shim Shim Club in May of 1989. She returned to Leesville in June to pay for her safety deposit box and see her son. She returned to New York City in July of 1989, and stayed until New Year's Eve of 1989.
Ms. Perez testified she worked as a masseuse receiving tips for one-hour massages. Customers paid the club a $20.00 entrance fee and then gave a tip from $20.00 up to $150.00 to the masseuse after the massage. Ms. Perez said she performed seven to eight massages each day every day of the week and worked eighteen hours a day. She did not have to give any money back to the club, nor did she have to pay rent. Ms. Perez kept the cash in her room, her makeup case, and throughout the club in envelopes marked with her professional name, "Connie," the amount of money contained in the envelope, and the date the cash had accumulated to an amount of one thousand dollars or more.
At the forfeiture hearing, Ms. Perez said she gave her money to an "old lady" or "grandma" who kept the money safe for her. This same "old lady" purchased money orders for Ms. Perez.
Ms. Perez admitted she lied about the source of her money and the location of a record book of her earnings as a masseuse, but she refused to answer any questions about her engaging in prostitution, citing her privilege against self-incrimination.
Ms. Perez admitted she had a safety deposit box, a savings account and a checking account at banks in Leesville, but she chose to carry the cash with her.
Concerning the envelopes and their notations, the dates begin in September of 1989, and continue to December of 1989, but Ms. Perez began work in July of 1989. Ms. Perez testified she began to earn money in July of 1989, but did not date an envelope until she gave it to the "old lady." She also gave another explanation of the date on the envelopes. She said that the date was when the cash accumulated to an even hundred-dollar amount. Ms. Perez testified that the reason why she waited until the cash was accumulated in even amounts, such as one thousand dollars ($1,000.00), was so she could see how much money she had made, and return to Leesville when she had saved enough money.
ASSIGNMENT OF ERROR NO. 1:
By its first assignment of error on application for rehearing, the state contends that the trial court did not err in finding a connection between the drug trade and the money seized or Hui Suk Perez.
La.R.S. 40:2601 et seq. referred to as the "Seizure and Controlled Dangerous Substances Property Forfeiture Act of 1989" is a relatively new statute effective December 31, 1989. There is one reported case concerning this act, and it concerns the *581 sufficiency of the bond furnished by a claimant. State v. Walker, 597 So.2d 484 (La.App. 1 Cir.1992).
La.R.S. 40:2603 sets forth the conduct giving rise to forfeiture which is generally violating any provision of La.R.S. 40:961 et seq., the Uniform Controlled Dangerous Substances Law. Section 2604 lists the property subject to forfeiture:
§ 2604. Property subject to forfeiture
The following property is subject to seizure and forfeiture as contraband, derivative contraband, or property related to contraband under the provision of Section 4 of Article I of the Constitution of Louisiana:
(1) All controlled substances, raw materials, or controlled substance analogues that have been manufactured, distributed, dispensed, possessed, or acquired in violation of R.S. 40:961 et seq.
(2) All property that is either:
(a) Furnished or intended to be furnished by any person in exchange for a controlled substance in violation of R.S. 40:961 et seq.
(b) Used or intended to be used in any manner to facilitate conduct giving rise to forfeiture, provided that a conveyance subject to forfeiture solely in connection with conduct in violation of R.S. 40:961 et seq. may be forfeited only pursuant to the provisions of this Chapter.
(3) Proceeds of any conduct giving rise to forfeiture.
(4) All weapons possessed, used, or available for use in any manner to facilitate conduct giving rise to forfeiture.
(5) Any interest or security in, claim against, or property or contractual right of any kind affording a source of control over any enterprise that a person has established, operated, controlled, conducted, or participated in the conduct of through conduct giving rise to forfeiture.
Property may be seized without a warrant if there is probable cause to believe the property is subject to forfeiture. La.R.S. 40:2606B. The statute also sets forth procedures for commencement of forfeiture proceedings, property management and preservation, and filing of claims and exemptions.
In a judicial in rem proceeding pursuant to La.R.S. 40:2612, the district attorney shall have the initial burden of proving the existence of probable cause for forfeiture of the property. La.R.S. 40:2612G. If the state establishes probable cause, then the claimant has the burden of showing by a preponderance of the evidence that the claimant's interest in the property is not subject to forfeiture. Id.
Probable cause is a measure of proof more commonly associated with criminal cases than civil cases. La.R.S. 40:2601 et seq. does not contain a definition of "probable cause." In the context of criminal cases, probable cause exists when the facts and circumstances within the magistrate's or police officer's knowledge, or about which he had reasonably trustworthy information, are sufficient to justify a man of ordinary caution in believing that a crime has been committed. State v. Ruffin, 448 So.2d 1274, 1277 (La.1984). Probable cause in criminal cases must be judged by the probabilities and practical considerations of everyday life on which average men can be expected to act. Id.
In most civil cases, the burden of proof is preponderance of the evidence which is defined as follows:
Proof by preponderance of the evidence means that evidence, taken as a whole, shows that fact or cause shown to be proven is more probable than not. Crowell v. City of Alexandria Through Snyder, 558 So.2d 216 (La.1989).
In civil cases, probable cause is a standard of proof employed in defense of malicious prosecution claims to determine if a party was justified in filing criminal charges or civil lawsuits. In Young Oil Co. of Louisiana, Inc. v. Durbin, 412 So.2d 620 (La. App. 2 Cir.1982), the Second Circuit discussed the distinction between the standards of proof of preponderance of the evidence and probable cause.
Probable cause is not synonymous with "preponderance," being somewhere between "preponderance" and "suspicion." Id., at p. 626.
*582 Therefore, it can be said that probable cause is a standard of proof which is less than preponderance, but more than suspicion.
Because no reported Louisiana case has defined probable cause in the context of forfeiture proceedings, reference to the federal statute which is the source of La. R.S. 40:2601 et seq., and reference to the federal jurisprudence interpreting and applying this statute will be helpful. La.R.S. 40:2601 is derived from 21 U.S.C. § 881. Both the state and federal forfeiture statutes permit forfeiture of property upon a showing of probable cause for the belief that a connection exists between the property to be forfeited and a violation of narcotics laws, and the failure of a claimant to establish, by a preponderance of the evidence, a legitimate source of the property.
According to 21 U.S.C. § 881(a)(6), money used in, intended for use in, or traceable to a drug transaction is subject to forfeiture. The government bears the initial burden of proving probable cause to connect the currency to some form of criminal wrongdoing. However, it is not necessary that the government trace the currency to a particular drug transaction. U.S. v. One 1987 Mercedes 560 SEL, 919 F.2d 327 (5th Cir.1990); U.S. v. $4,255,625.39, 762 F.2d 895, 904 (11th Cir.1985), cert. denied, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986). As noted in One 1987 Mercedes 560 SEL:
Probable cause is a "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." ... It may be established by demonstrating "by some credible evidence, the probability that the money was in fact drug related.... Probable cause can be established by circumstantial or hearsay evidence."... (citations omitted) U.S. v. One 1987 Mercedes 560 SEL, 919 F.2d at 331 (citations omitted).
When judging the evidence, the federal courts look at the "totality of the circumstances" or "aggregate of facts." One 1987 Mercedes 560 SEL, supra; U.S. v. Padilla, 888 F.2d 642, 643 (9th Cir.1989). In One 1987 Mercedes 560 SEL, the federal Fifth Circuit noted:
This evidence goes beyond a mere suspicion. When evaluating whether a forfeiture is proper under a statute, the evidence "must be judged not with clinical detachment but with a common sense view to the realities of normal life.". . . .
Individually, each fact does not provide a strong showing of probable cause. "Parsing evidence in isolation for a fatal flaw," however, "threatens to transform the standard of `probable cause' into a steep threshold requirement that would impede the operation of the forfeiture statutes."

Id. at p. 332 (citations omitted).
The Ninth Circuit noted in U.S. v. Padilla, supra:
This circuit applies an "aggregate of facts" test to find probable cause for forfeiture.... Probable cause cannot be shown unless the aggregate of facts gives rise to more than mere suspicion that the property was exchanged for or intended to be exchanged for drugs; the presence or absence of any single fact is not dispositive.
Circumstantial evidence of drug transactions may support the establishment of probable cause.
We have said that in assessing probable cause an "extremely large amount of money found in the household itself is strong evidence that the money was furnished or intended to be furnished in return for drugs." ... However, the test requires more than the mere existence of a large amount of cash to establish a connection between that cash and illegal drug transactions: the money must be "in combination with other persuasive circumstantial evidence." ... Particularly persuasive is the presence of drugs or drug paraphernalia.

Id. at pp. 643-644. (citations omitted)
Because this forfeiture proceeding is a civil proceeding governed by the Louisiana Code of Civil Procedure, La.R.S. 40:2611K, the standard of review of the trial court's ruling should be that as set *583 forth by Rosell v. Esco, 549 So.2d 840 (La.1989).
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable...... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.

Id. at p. 844. (citations omitted).
As was noted previously, the state must establish probable cause to believe that the money is subject to forfeiture because it was furnished or intended to be furnished in exchange for narcotics, it was used or intended to be used to facilitate a narcotics violation, it was the proceeds of a narcotics violation, or it fell under one of the other statutory provisions for property subject to forfeiture. La.R.S. 40:2604 and 2612.
The trial judge listed the facts established at the forfeiture hearing and then relied upon the expert testimony of John Nattinger, an agent for the Drug Enforcement Administration, (DEA), to conclude that the state had established the money was forfeitable.
In his testimony, Mr. Nattinger listed twelve factors which are considered in determining whether or not an individual is a courier for drug money. The state argues it presented evidence which showed Ms. Perez met all of the twelve factors. We will review these factors and the evidence presented.
1. Possessing large sums of money. When Ms. Perez was stopped she had with her approximately sixty-three thousand dollars ($63,000.00) in cash and U.S. Postal money orders.
2. No records or receipts for money. No records, receipts or earnings forms were located.
3. Cash in large and small denominations. The contents of each envelope did not contain consistent denominations of bills, but consistently added up to an even hundred-dollar amount such as one thousand dollars ($1,000.00), fifteen hundred dollars ($1,500.00), or more. According to Nattinger, the same money paid on the street for drugs is ultimately paid to the distributor since drug dealers cannot use banks without arousing suspicion for large cash transactions, or without leaving a "paper trail" which may be used against them in a criminal trial. Therefore, both large and small denominations of currency are used to pay for drugs supplied by drug sources or distributors.
4. Inconsistent explanation for money. Ms. Perez gave three different explanations for her possessing so much cash: her boyfriend gave her the money which she saved over a long period of time; she earned the money from tips as a cocktail waitress at the New Seoul Restaurant in New York City; and finally, she earned the money from tips as a masseuse at the Shim Shim Club in New York City. Ms. Perez admitted at the hearing that she lied on January 2, 1990, about the source of the money because she was scared.
5. Attempts to abandon the money. The evidence of Ms. Perez's attempt to throw out some of the money is questionable. Trooper Herbert Cross of the Louisiana State Police testified that James Carver, Ms. Perez's babysitter and driver of the truck stopped, told him Ms. Perez wanted Carver to throw out the panty hose with the money while they were sitting in the back of the state police car. Ms. Perez *584 testified that she was joking with Carver about throwing out the money.
6. Failure to report earnings on income tax. Because the money couriers, commonly called "mules" or "smurfs", are paid in cash, this income is not reported on income tax returns. Ms. Perez admitted she had not filed income tax returns since 1982.
7. Positive alert by drug detection dog. Trooper Timothy Ledet testified that his drug detection dog made a positive alert on the money in the tote, or carry-on, bag belonging to Ms. Perez. These were the bricks or bundles of money contained in envelopes and wrapped in black plastic and rubber bands. However, no analysis was done to determine what narcotic, if any, was contained in the money. No positive alert was made for the money in panty hose or Perez's wallet.
8. Packaging of currency. Mr. Nattinger explained that the various denominations of cash are placed in envelopes in even hundred-dollar amounts such as one thousand dollars ($1,000.00), fifteen hundred dollars ($1,500.00), or five thousand dollars ($5,000.00), to facilitate the quick transfer of the money. A drug dealer will grab one envelope or bundle and count it, and then assume all other envelopes or bundles contain the same amount of money. This way the dealer counts one envelope containing one thousand dollars in cash, rather than all ten or twenty thousand dollars in cash, and the transfer of drugs and money or the transfer of money, itself, will be completed more quickly.
9. Concealing money on person or keeping money close at hand. With the exception of the money orders Ms. Perez mailed to herself in Leesville, the other cash and money orders were concealed under her clothes in panty hose tied around her waist, in her wallet, or in her carry-on tote bag. If money is in a suitcase checked in at the airport, it may be lost by the airline, or the money may be detected in an X-ray security machine, and the suspicions of the authorities aroused.
10. Traveling from "consumption" city to "source" city. Mr. Nattinger testified that Houston and Los Angeles are the two primary "source" cities for cocaine and marijuana. New York City is a "consumption," or distribution, city where the narcotics are sold and from where the money generated must be returned to the "source" city. Ms. Perez always traveled from New York City to Houston.
11. Attempts to avoid Currency Transaction Reports, (CTR). In order to halt the use of currency in illegal transactions, the federal government now requires a report to the Treasury Department when ten thousand dollars ($10,000.00) cash is deposited in a bank or used in a commercial transaction. Mules or smurfs avoid CTRs by using money orders or cash. The largest amount for a U.S. Postal Service money order is seven hundred dollars ($700.00), and Ms. Perez had fourteen (14) money orders, all made payable to her and all in the amount of seven hundred dollars ($700.00). By the numbers on the money orders, Mr. Nattinger determined when the money orders were purchased and from which post office: on September 5, 1989, Perez purchased one money order from post office # 10031; on September 6, 1989, Perez purchased five money orders from post office # 100031, and six money orders from post office # 100013; and finally, on September 15, 1989, Perez purchased two money orders from post office # 100031. Mr. Nattinger concluded that if Ms. Perez had purchased all the money orders at once or at the same post office, she would have raised suspicions which is what she was trying to avoid. Ms. Perez testified that even though she had a checking account, savings account and safety deposit box in banks in Leesville, she did not wire the money to her bank. (R.p. 285). She also testified that the "old lady" obtained the money orders on behalf of Ms. Perez.
12. Large cash purchases and high standard of living with no visible means of support. Ms. Perez worked off and on as a waitress in restaurants and bars from 1983 until 1987. In 1987, Ms. Perez claimed she worked at the Shim Shim Club for six weeks and then returned to work as a waitress in a Leesville bar. In 1988, Ms. Perez bought the Golden Bell Club for thirteen *585 thousand dollars ($13,000.00) cash, plus she purchased a new car for twelve thousand dollars ($12,000.00) cash. Ms. Perez claimed the money to buy the bar came from her savings as a waitress and not her earnings from the Shim Shim Club, but part of the money to buy the car came from her earnings at the Shim Shim Club as well as her savings.
Mr. Nattinger concluded that the large amount of money Ms. Perez had with her came from drug trafficking and not other illegal sources of cash such as prostitution or gambling. Mr. Nattinger explained that money generated by gambling or prostitution does not need to be transported from the place where it is generated, but money generated by drugs must be transported to the source city of drugs in order for the local distributor to pay the provider of the drugs. Because more cocaine than marijuana is transported from Houston to New York City, Mr. Nattinger concluded that the money transported by Ms. Perez probably came from the sale of cocaine.
Mr. Nattinger was thoroughly cross-examined. He admitted that many legitimate businesses use cash to pay their debts or make purchases. Also, some small businesses with self-employed owners avoid paying their fair share of income taxes by using cash. The purpose of money laundering is to take the money generated by drug trafficking and put it in general commerce without arousing suspicion as to the unlawful origin of the money. This can be achieved by a business such as a bar or restaurant which normally have large cash deposits making a larger deposit of cash, or by a business using more cash to pay expenses. Ms. Perez owned a bar, the Golden Bell Club, in Leesville.
Mr. Nattinger admitted that the failure to keep business records or receipts is not illegal, per se, and does not mean that the business is involved in drug trafficking or money laundering.
Mr. Nattinger's conclusion was based upon the "totality of the circumstances" of this case. Nationwide, there are organizations devoted solely to the transportation of money generated by drug trafficking and laundering this money for use in general commerce. Those persons involved in drug distribution are not the same ones who are involved in transporting the money. For example, Mr. Nattinger noted that a "mule" or "smurf" concerned only with transporting the money would attach it to his body because a drug dealer exchanging the money for drugs would need it handy in order to transfer it quickly.
As this court noted in its original opinion, the weakness in the state's case is connecting the money transported by Ms. Perez, or even Ms. Perez, to any violation of Louisiana's narcotics laws. No "innocent" explanation for Ms. Perez's possession of such a large amount of cash was established. However, the state's burden under La.R.S. 40:2601 et seq. was to first connect the money to illegal narcotics violations. If the money was generated by other illegal activities, such as prostitution or gambling, then the State of Louisiana could not obtain forfeiture under La.R.S. 40:1601 et seq.
The possibility that the money possessed by Ms. Perez was generated by another illegal activity, prostitution, was presented when Ms. Perez pleaded the Fifth Amendment when the state asked her if she earned any of her money from prostitution. Ms. Perez created an inference that the money came from prostitution which would prevent the state from obtaining forfeiture pursuant to La.R.S. 40:2601 et seq. The circumstances of her employment as a masseuse further strengthen this inference.
Ms. Perez testified that customers paid a twenty dollar ($20.00) entrance fee to the Shim Shim Club and then paid a tip to the masseuse, ranging from twenty dollars ($20.00) to one hundred fifty dollars ($150.00), for a one-hour massage. Ms. Perez had no formal training in massage except what the manager of the club showed her. Ms. Perez claimed she worked at the club eighteen (18) hours each day for seven days a week, performing six to seven massages per day, and receiving an average tip from eighty dollars ($80.00) to one hundred dollars ($100.00) for each massage. Ms. Perez claimed she did not have to give any of the money she earned back to the club, paid no rent, and shared the expenses of food with the other girls at the club. The trial judge did not to believe *586 that a masseuse could earn as much money as Ms. Perez claimed.
It was the state's burden to establish probable cause to forfeit based upon La. R.S. 40:2601 et seq.
Those factors which weigh in favor of forfeiture are the manner of packaging the cash in envelopes in even hundred-dollar amounts which facilitate quick transfer; wrapping some of the money into bricks or bundle covered in black plastic and rubber bands; a positive alert by a drug detecting dog for the plastic-wrapped bundles of envelopes; the sudden and dramatic increase in the lifestyle of Ms. Perez coinciding with her trips to New York City, but not the result of an increase in her bar's business, and Ms. Perez's inconsistent statements concerning the source of the money.
On the other hand, possessing large amounts of cash does not automatically mean that the possessor is involved with drug trafficking or money laundering. The failure to have receipts or records, or a consistent explanation for the source of the money, may give rise to suspicion that the possessor is evading taxes or that the money is derived from illegal sources. However, in the present case the illegal source of the money must be narcotics violations in order to sustain forfeiture: money derived from illegal gambling or prostitution may be subject to other federal forfeiture statutes, but the state's right to forfeiture in this case is limited by La.R.S. 40:2601 et seq.
Ms. Perez presented the testimony of Mr. Don B. Chae, a Korean-American attorney, who testified that Korean immigrants, such as Ms. Perez, do not use banks because they distrust banking institutions as prejudiced against Koreans, and because only wealthy Koreans or businessmen use banks in Korea and everyone else is paid and uses cash.
The weakness of the state's case is the lack of evidence connecting the money or Ms. Perez to drug trafficking. There was no evidence, direct or circumstantial, connecting Ms. Perez with drug trafficking. The evidence connecting the money seized to drug trafficking was based upon the facts of the seizure and Ms. Perez's previous trips out of town, plus inferences and conclusions drawn by an expert witness. Although there was testimony that a drug detection dog gave a positive alert to the presence of drug residue, the State apparently did not have the tote bag and money analyzed at a laboratory. The drug residue may well have come from a prior possessor of the money, not related to Ms. Perez. Finally, there is more reason to believe that the money was generated by prostitution, than by drug trafficking. We conclude that the state's evidence did not rise above a suspicion that the money was connected to drug trafficking.
ASSIGNMENT OF ERROR NO. 2:
This assignment of error concerns our mention of State v. Spooner, 520 So.2d 336 (La.1988), in our original opinion. Spooner concerned a separate forfeiture statute, La. R.S. 32:1550, and a statutory presumption contained in that statute. The statutory presumption required the claimant to prove by clear and convincing evidence that money found in close proximity to illegal narcotics was not forfeitable derivative contraband. La.R.S. 32:1550(A)(7)(c). The Louisiana Supreme Court ruled that the statutory provision created an unconstitutional mandatory presumption in violation of the Louisiana constitutional provision on property rights, La. Const. Art. 1, § 4, and the federal and state constitutional rights to due process of law.
The Spooner opinion concluded that forfeiture of money remains permissible, but the state had to prove that the money was derivative contraband.
The reaction to the Spooner decision was amendment of the Louisiana constitution and enactment of La.R.S. 40:2601 et seq. Article 1, § 4 was amended from the original provision, "Personal effects, other than contraband, shall never be taken," to provide:
Personal effects shall never be taken. But the following property may be forfeited and disposed of in a civil proceeding, as provided by law: contraband drugs; property derived in whole or in part from contraband drugs; property used in the distribution, transfer, sale, felony possession, manufacture, or transportation *587 of contraband drugs; property furnished or intended to be furnished in exchange for contraband drugs; property used or intended to be used to facilitate any of the above conduct; or other property because the above described property has been rendered unavailable.
As was noted previously the new forfeiture provision, La.R.S. 40:2601 et seq., which followed in the present case, is patterned after the federal forfeiture provision, 21 U.S.C. § 881. The burden of proof for the state and the claimant are different under this new statutory provision and the burden of proof is clearly set forth. Because the previous statutory provision of La.R.S. 32:1550 is very different than the provision used in the present case, reliance upon La.R.S. 32:1550 would be improper. We cited Spooner in our original opinion merely as an example of a forfeiture proceeding in which the evidence presented was not sufficient to support forfeiture.
For the foregoing reasons, we adhere to our original opinion.
NOTES
[*] Honorable Bernard N. Marcantel participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.